Baxter, C. J.
The case against the Nashville, Chattanooga & St. Louis Railway will be the first disposed of. We have not the time to state fully, and in detail, all the reasons for the decree we feel bound to enter in this case. The question is both novel and interesting, as well to the public as to the parties, and may be thus stated:
The express business, as it is understood and carried on in the United States, was initiated in 1839. About that time one Alvin Adams began the carriage of small packages of *466 value between the cities of Boston and New York over the line of the Boston & Worcester Railroad, and the line of steamers connecting therewith, and plying between New York and Norwich. This enterprise proved remunerative. His success induced others to establish and maintain similar express lines between New York and Philadelphia, and Philadelphia and Baltimore, and other important commercial points. These all succeeded well, and grew into general favor, and continued in actual operation until July, 1854. At this time, by the mutual consent of the parties interested, these several express companies were consolidated and merged into the Adams Express Company, a voluntary association or partnership, which was formed and organized under the authority of the laws of New York. This company, upon its organization, entered actively upon business, and prosecuted the same with unusual energy and success; it extended its operations over many of the most prominent railroads and water lines, and earned, as it justly merited, the confidence of its patrons and the general public. At the commencement of the rebellion it was doing an extensive and profitable business within the southern states, but the exigencies of war forced a suspension of its business within the insurrectionary territory, of which exigencies the complainant, the Southern Express Company, was born.
The complainant is a corporation organized under and pursuant to a charter granted by the state of Georgia, and by purchase succeeded to the property, business and goodwill of the Adams Express Company, within the southern states; but the two companies, notwithstanding their separate existence, sustained close business relations, and agreed to the interchange of freights on terms beneficial to themselves- and to their customers. By this friendly co-operation and judicious interchange of business they so far preserved their unity as to secure to their patrons all the conveniences that could have been afforded by one company doing the business within the territory occupied by them both. Among other business of the Adams Express Company, to which complainant succeeded, was the business which the former company *467 was then doing over the several railroads, so far as they were then in existence, which now constitute the property of the Nashville, Chattanooga & St. Louis Railway Company, which complainant has continued from its organization to the present time. But it did said business under special contracts. These contracts contained stipulations reserving to the respective parties the right, upon giving the notice prescribed therein, to terminate the same.
Recently, many changeB in the ownership and consequently in the management of railroads in Kentucky, Tennessee and contiguous states have taken place, whereby the Louisville & Nashville Railroad Company’s power has been greatly augmented. The managers of this company, by leases and otherwise, have acquired the control, it is said, of about 4,000 miles of railroad. The bill alleges that they have recently organized the Union Express Company, to transact the express business over the several railroad lines controlled by it; and that, with the view of supplanting the complainant, and substituting the Union Express Company as express carrier on said roads, they caused notices to be given complainant terminating the contracts under and in virtue of which complainant has been carrying over said roads. This charge, however, is denied. But, if such was defendant’s purpose, on being better advised the programme has been abandoned, and defendant now concedes that it cannot legally thus discriminate between express carriers; that if it carries for any it is legally bound to carry for every one offering to do the same sort of business on the same terms. But defendant is, it seems, determined to exclude complainant from the use of its roads, and now proposes, as the only alternative left for the effectuation of its determination, to exclude all express carriers, and do the express business over its road itself. And hence the question is squarely presented, can defendant legally refuse to carry for complainant, and extend to its messengers and agents all the facilities hitherto extended to it, and undertake and do the express business over its road itself? This is the question which the facts present.
In order to a correct solution thereof let us contemplate *468 briefly the objects for which railroads were created, and the obligations and duties imposed on them by law.
Railroads are quasi public institutions; they are authorized to facilitate, and not to control or force from legitimate and natural channels, or hinder or obstruct, the business of the country. Hence, the companies organized to construct them were invested with the right of eminent domain, with authority to condemn private property necessary to the full enjoyment of their franchise, on paying just compensation therefor. The •authority to do this could only be conferred upon the theory that the public interests which they are supposed to represent require such seizure and appropriation. Under our government private property cannot be taken for any other than public uses; vested rights can be made to yield only to the public necessities. Railroads are held to be such necessities, and it is solely on this ground that their construction has been encouraged by liberal grants of power, and aided by private and public contributions. As quasi public instrumentalities, organized to promote the public good, they are, unless plainly and constitutionally exempted from such liability, amenable to such just regulations as the legislative department may choose from time to time to prescribe. All laws deemed necessary to insure good faith in the exercise of their franchises, or to enforce an honest, impartial and efficient discharge of their legal duties and obligations, may be enacted, and if the right has not been contracted away the legislature may prescribe their schedule of charges, compel every necessary facility to the public and to individuals, to the extent of their means, enact police regulations, limit the speed of trains, command the use of signals, and order or inhibit the doing of any and everything expedient to advance the general interest of commerce and intercommunication, insure safety to travelers, and generally to subserve the purposes of their creation, restricted only by the constitutional limitation that vested rights are not impaired without just compensation; and they are as amenable to the unwritten (as it has been judicially expounded) as to the "statute law.
The first, and perhaps the most important, of these princi *469 pies settled by judicial decisions is that railroad companies, as common carriers, are bound to the extent of their corporate means to supply all the accommodations and facilities demanded by the regular and ordinary business of the country through which they pass. Eailroad carriage has, in a large measure, suspended every other means of inland transportation. Everybody, whether they will or not, is forced to patronize them. And as they were created to subserve the public good, and undertook to carry persons and property, they are, if able, bound to supply every facility needed for that purpose. They must keep pace with improvements in machinery, furnish easy access to and egress from their trains, stop at convenient points for the admission and exit-of passengers, make adequate provision and tender suitable-cars to carry on the business offered, and generally to carry passengers and freight, and from time to time adapt their rolling stock and equipments to the varying necessities of advancing civilization and approved methods of doing business. And next in importance to this leading idea is the obligation to do exact and even-handed justice to everybody offering to do business with them. If derelict in the performance of any one of the obligations imposed by law, they may be quickened thereto by the mandatory power of the courts, or compelled to surrender their franchise, which they thus refuse or neglect to exercise in the spirit of then several charters.
But defendants deny that any one or all of the foregoing familiar principles reach and control the question in this case. Its position, as we understand it, is that, notwithstanding it is a quasi public instrumentality, it is also private property belonging to defendant, and that it is ready, able and willing, and now offers, to render to the public every service which the public has a right to demand, including the carriage of express matter over its road, and protests that complainant has no legal right to use its road against its wishes and in the manner claimed, and by a forced use thereof enter into competition with it in the carriage and delivery of express freights. At first blush this position seems to be well taken, but on *470 further consideration is found to be more plausible than substantial. As a common carrier the defendant is as much bound to carry for another common carrier as it is to carry for other persons. The proposition, as it is stated, will not be controverted. Defendant, cannot, and does not, deny its obligation to carry for the complainant. Its claim is that it is only bound to carry for the complainant when complainant, like other forwarders, delivers its freight into its care and custody to be. handled, transported and delivered by it through its own agents and servants, and that complainant has no legal right to demand and enforce the use of defendant’s passenger trains for the purpose of carrying freight in the special keeping of its own employes, to be by them handled in transit, and delivered at way stations and other places of consignment, and to have provided, therefor special accommodations, such as have been heretofore supplied to it under special contracts. It is upon this point the contest is to turn. The issue is not, therefore, whether the defendant is bound to carry forithe complainant, but can it be compelled to carry in the manner and with, the divided responsibility proposed. Herein lies the- novelty and importance of the question.
No such, question could have well arisen a half a century ago, because the methods of doing business and the facilities then provided, for inland transportation were not such as to raise it.. But we- have made wonderful progress since that time in physical as well as mechanical development, and no instrumentality subject to man’s service has been more potential in bringing about the change than, railroads. Tropical fruits, fish from the oceans and lakes, and oysters from the bays, are now, through the co-operative energies of railroads and express carriers, within the reach of almost every community. These facilities, making possible and suggesting never-ending, changes in the methods of business, and gradually, but certainly, making changes in the habits and tastes of the masses of our. people, have opened up the way for and called express transportation into use.. The duties and offices of railroads and express carriers are widely different and totally distinct. The former was created to fur *471 nish 'motive power, and to receive, carry and deliver such freights as are appropriate to such a mode of transportation; but the legislatures granting them charters, with, perhaps, few exceptions, never contemplated nor expected them to carry money, gold or silver bullion, bonds, bank notes, deeds and other valuable papers, jewels and other small articles of great value, fruits, fresh meats, fish or oysters, or other like commodities liable to rapid decay, or live animals requiring special care and attention during their transportation. Nor are railroad companies authorized by their charters to receive notes, drafts, or other choses in action for collection and return of proceeds, nor to receive and forward freight with the bills and charges of forwarders attached, to be collected from the consignee on delivery and returned to the shipper, and in connection with such business to afford to the public, under a single carrier and an assured responsibility, safe, reliable and speedy transportation from and to all points accessible by the use of two or more railroads. Nor are railroads, under their charters, required to render such services.
Much of the services rendered by express carriers, and appropriate to their peculiar functions, is not such as is by law imposed on railroads. If express carriers were ejected from the railroads the latter could not be compelled to supply their places, and, consequently, the country would be without such facilities, unless the railroad companies would exceed their corporate obligations and voluntarily undertake to do what they are not legally required to do, and to do many things which, under their charters, they have no right to do. As they are under no legal obligation to render such accommodations to the public, and could not be compelled to render them, they could, after ejecting the express carriers, monopolize the business, and dictate oppressive rates, while affording less safety, celerity and convenience to customers. As a substitute for the expeditious, reliable and necessary services of expressmen, the country would be dependent upon an illegal assumption of authority by railroads — an assumption, in some respects, in contravention of public policy, because it would enlarge their powers and influence for controlling the *472 business of the country, which, to say the least, is already sufficiently formidable.
It is enough to say that railroads were not created to do an express business, and possess no legal rights to engage in it, cannot be required to undertake and perform it, and, I may add, ought not to be permitted to engage in those branches of the express business ultra vires their corporate powers. And as they are not legally bound to render express facilities to the country themselves, can they, by excluding the express-men, deprive the public altogether of these necessary facilities, or else exact such concessions as the petty resentments or the cupidity of their managers might prompt them to exact ? We think not. On the contrary, if the express business, as we have hereinbefore asserted, has become a convenience to the general public, we think it the duty of all railroad companies, through their managers, and in the exercise of the trusts confided to them for the public good, to make proper provision for everybody wishing to carry express matter over their respective roads, as, in doing so, they would be accommodating the public and fulfilling to that extent the objects and purposes of their creation.
The express business, which had its inception as herein previously stated, now extends all over the states, is carried on by numerous organizations which meet the requirements of the several localities in which they do business, and occupies every railroad line in the country available for the purpose. They have an invested capital of over $30,000,000, and the Adams and Southern Express Companies are in daily use and occupation of 21,216 miles of railroad; employ 4,297 persons; make 911 daily trips over 64,560 miles, aggregating 19,884,420 miles travel annually, and in the transportation of their freight they pay the railroad companies over $2,000,-000 per year. It is further alleged, as showing the extent and magnitude of the express business, that these companies carried for the government $1,200,000,000 in 1878, and $661,-000,000 in 1879, and for private parties in the last-named year the enormous sum of $1,080,000,000; and that the Adams Express Company alone receives and disburses an average in *473 New York city of 14,000 packages daily, employing therefor, in connection with its general business, 918 horses, with the necessary number of wagons.
From this summary it will be seen that the express carriage of the country is only second in importance to railroad transportation, and that the express business has so interwoven itself into the present methods that it cannot be dispensed with without producing an abrupt and disastrous revolution in the present mode of carrying on trade. It has grown into immense proportions, and has become a necessity that cannot be dispensed with. It has obtained its present enlarged usefulness under the fostering care of the railroads themselves, including the defendant company. It is profitable to the railroads, and useful and convenient to the public. The right of the public to have quick, reliable and safe carriage of goods through expressmen has been recognized for forty years. This general recognition by the public and by railroad corporations, in connection with its admitted utility, stamps it as a legitimate mode of railroad carriage. It is legitimately within the scope of their charters; it is a legal duty imposed by law upon them. Endowed with extraordinary privileges, to enable them to fulfil the purposes of their being, they may be coerced to adapt their accommodations to the varying wants and necessities of general trade. They must keep abreast of advancing thought as well as of mechanical development. If they are under a legal obligation to attach a Westenhouse air brake, or a Miller platform, as insuring greater safety to employes and passengers, they are likewise bound to adapt their facilities for transportation to the growing demand and conveniences of trade. Such requirements can work no injustice to them, and is no invasion of their vested rights. For such improved service they are entitled to compensation to the extent of the maximum allowed by their respective charters. No express carrier can lawfully demand the carriage of Ms goods without paying reasonable rates therefor. The carriage of such freights is in the strict line of railroad duty. It is a class of business that pays well, and such as the railroads have heretofore *474 sought after. If the custody of the freights is retained by the express carriers, the railroads will not be liable for anything more than the safe carriage of them. If they provide for the carrying and safely transport such freight, they will have done their full duty. And by doing this the railroads will receive their freight charges, the expressmen will be enabled to fulfil their engagements and continue their business, keep up the continuity of their connections, and the public will be supplied with an indispensable facility, and no injury or injustice will be done to any one, unless it may be that railroad companies and railroad managers may be deprived thereby of incidental profits and advantages to be obtained through unauthorized pursuit, and forced from the public by reason of the monopoly secured through the exclusion of lawful competition. We conclude, therefore, that upon the naked obligation which the la;w imposes upon railroad companies, and without reference to the consideration to be hereafter adverted to, that the defendant is bound to render the services demanded by complainant, and that this court, in the exercise of its discretion, ought to require defendant to discharge its legal duty in this regard.
The second ground on which we think the relief prayed for may be granted is this: Complainant and the Adams Express Company have for more than twenty years done business over the system of roads now directly and indirectly under the control of the managers of the Louisville & Nashville Railroad Company. By energy and fidelity, and the expenditure of a large amount of money, complainant has succeded in building up and establishing a lucrative business over these lines, which constitute important links, securing continuity in its operations. It has trained and reliable servants, •suitable chests, safes, wagons, horses, and trucks for collecting, transferring and delivering their freights; erected permanent shops and warerooms at various stations; established rapid communication, and fixed and published a schedule of charges, and have a good and profitable, steady and reliable business, and an enviable and widely-advertised reputation; all of which has been accomplished and the rights incident thereto *475 acquired under the friendly auspices of those who are now seeking to deprive complainant of the use of defendant’s road.
If defendant possessed the legal right, which he here claimed, to refuse the accommodation which it has heretofore extended to complainant, it ought not to be permitted to exercise it under the facts of this case. Defendant’s long acquiescence in complainant’s right to have transportation of its freight, the holding itself out for so long a time as a carrier of express matter, the encouragement it has always given to this class of business, considered in conection with the investments made and the rights of the public to such service, must, in our judgment, estop it from exerting its authority to exclude complainant, if it had any at this time.
A refusal to carry as heretofore for the complainant would inevitably do it great pecuniary injury, dissever its connections, cause it to lose the good-will of its customers, and depreciate its valuable property and equipments along defendant’s road perhaps one-half. Complainant ought not to be held to be so dependent on the mercy of its adversaries and interested competitors seeking to drive it from the field in order to secure a monopoly to themselves.
Defendant responds, saying that hitherto the complainant has occupied its road under and by virtue of special contracts, and it contends that complainant’s enjoyment of the privileges thus granted confers nothing more than was accorded by its contracts. The position, in a qualified sense, is correct. But it is equally correct that complainant lost nothing thereby. A farmer or other person wishing to ship one or more car loads of stock or grain, or other commodity, may, with a view to convenience, specially contract for a ear or ears suitable for the particular purpose, to be furnished at a specified time and place, and for such other facilities as he may need. But his doing so is no surrender of his legal rights» existing independently of contracts or special agreements, to demand of a railroad company the shipments of all suitable freights tendered for the purpose. The same principle is applicable here. It was altogether proper that the complainant and defendant, in view of the magnitude of their business, *476 should by special contract stipulate for the facilities to be furnished by the one to the other, and fix the terms and conditions upon which the business should be done. But no right arising to the complainant from public considerations or the charter obligations of the defendant was thereby waived. Their contracts were in affirmance of the pre-existing legal rights of the complainant, and an admission by defendant that the business proposed was within the scope of its duties and reasonably remunerative. It was in reliance upon these rights conferred by law and public consideration, and thus recognized by defendant, that the complainant made the investments mentioned, and built up and established its business ; and it would be no lec3 than a fraud upon it for the defendant to exclude it from all further use of its road, rob it of its established, extensive and profitable business, and transfer it to another or appropriate the business to itself. It will not be permitted to perpetrate such injustice.
We do not wish to be misunderstood. The fact that the complainant had preoccupied defendant’s road confers no priority of right. The defendant, to the extent of its corporate authority, the Union Express Company, and all other persons or companies wishing to engage in the carrying of express matter over defendant’s road, can enter upon that business on equal terms with the complainant. Neither the railroad companies nor the courts can discriminate in favor of one or more parties as against others. All are entitled to the same measure of accommodation who may offer to do the like business, and it is the duty of the court to enforce, whenever applied to, this legal rule of impartial justice. We have no disposition to discourage or hinder any one from entering into competition with the complainant. The more of them the better it will be for the railroads, as well as for the public; the railroads will thereby have more business, and the public be better protected against exorbitant prices and the exactions of aggregated wealth and business combinations. Equal protection to all will do this. It can never, however, be obtained by taking the fruit of one man’s labor and giving it to another.
*477 Antagonisms between railroads and the public exist more or less in every locality, and is too often manifested in the verdicts of juries, unjust legislation, and various other ways. This is to be regretted. But the surest way of counteracting these popular resentments is to require the railroad companies and their managers to keep within their legitimate spheres, and compel them in good faith to administer the trusts confided to them for the public good. The court is as ready to protect railroad companies in the full enjoyment of their franchises, and against the injustice mentioned already, as it is to compel them to do their duty to the public.
Judge Gresham, of Indiana, Judge Treat, of Missouri, and Judge Wood, of the fifth district, indicated the bent of their minds by granting restraining orders similar to the one issued in this case. I have consulted two of the district judges in this circuit who concurred in the conclusions herein announced. Judge Harlan, as I understand his recent decree, decided the same question in the same way; and the associate justice' assigned to this circuit, on being requested, a few days since, to sit with me on the hearing of this motion, said that he had confidence in the learning and accurate discrimination of Justice Harlan, and that he had no idea that he would, after investigation, etc., dissent from the decision made by the former. These intimations and concurrent views, coming from so many and such high sources, have very materially strengthened the convictions which I have myself entertained in relation to the questions involved. I shall follow the ruling of Justice Harlan, and continue the restraining order until a final hearing can be had.
The following order was then entered:
“The motion of the complainant for a preliminary injunction herein, according to the prayer of the original and supplemental bill herein, having been brought on to be heard, and counsel for the respective parties having appeared and been heard, and the court having duly considered the questions involved, does hereby order that a preliminary injunction be issued herein restraining the said defendant, its agents, officers and servants, during the pendency of this suit, from *478 interfering with, or disturbing in any manner, the enjoyment by the Adams Express Company of the facilities now accorded to it by the said defendant upon its lines of railway, for the transaction of the business of the said Adams Express Company, and of the express business of the public confided to its care; and from interfering with any of the express matter or messengers of the Adams Express Company; and from excluding or ejecting any of its express matter, or messengers, or employes, from the depots, cars and lines of said defendant, as the same have been heretofore and are now enjoyed and occupied by the said Adams Express Company; and from refusing to receive and transport in like manner, as the said defendant is now doing, over its lines of railway, express matter and messengers of the said Adams Express Company; aud from interfering with or disturbing the business of the said Adams Express Company in any way or manner whatsoever, and from refusing to permit the Adams Express Company to continue the transaction of its said business over the lines of the defendant on the same terms, conditions, privileges, facilities and accomodations as are or may be permitted or accorded to any other express company, or to or by the defendant itself, in the conduct of an express business over its railway lines, upon the payment by the said Adams Express Company of all lawful and reasonable charges which may be properly demanded by the said defendant, or paid by such other express company or by the public to the defendant therefor, not in excess of the rates authorized by its charter, and not in excess of the rates charged to others for similar services, nor of those received by the defendant from shippers of express matter to be carried by the defendant as such; in the last case, less the reasonable cost of the accessorial service rendered by the railroad lines, and at the stations and on the trains of the said defendant, and with liberty to the parties to make such further application herein to the court as they may be advised is necessary to fix what is and shall be a lawful and reasonable compensation, or for any other matter growing out of the case. In event of a dispute between the *479 parties, pending the preparation of this cause, as to what is reasonable compensation for the services performed by the defendant company, and what is a reasonable rebate to be allowed for such accessorial service, such difference shall be referred to the court, after due notice, and pending such refference the complainant shall not be disturbed by the defendant company in the transaction of express business over its line.”