*(Circuit Court of Cook County. In Chancery.)*

## The Public Grain and Stock Exchange

### vs.

## The Western Union Telegraph Company and Board of Trade, et al.

## The Public Grain and Stock Exchange

### vs.

## Baltimore and Ohio Telegraph Company, et al.

(1883.)

1. MONOPOLIES—DESTRUCTION OF COMPETITION. Neither the establishing of monopolies nor the destruction of competition are looked upon with favor by the courts.

2. TELEGRAPH COMPANIES FURNISHING MARKET QUOTATIONS—WHETHER AFFECTED WITH A PUBLIC USE. Where a telegraph company as incident to its regular telegraph business procures market quotations on the board of trade and circulates such quotations over "tickers," such incidental business is affected with a public use, and the quotations must be furnished to all alike without discrimination.

3. SAME—BUCKET SHOPS—EQUITABLE AID. Where the complainant seeks to compel the defendant to furnish it market quotations and it is made to appear that such quotations are desired for the purpose of conducting a "bucket shop" or any other illegal business, a court of equity will not lend its aid for any such purpose. But before relief is denied there must be proof of such fact and not mere suspicion.

4. BOARD OF TRADE—RULES OF. Neither the courts nor the legislature can interfere with the actions of the board of trade as to the control of its own floor or the discipline of its members, but the business transacted upon the floor of the board of trade. is "affected with a public interest" to an extent which would authorize the legislature or the courts to prohibit such board from exercising any discrimination as to who shall receive its market quotations, or as to what telegraphic companies shall be allowed facilities for distributing the information to the public.

5. RIGHT TO RECEIVE MARKET QUOTATIONS—ORDER OF THIRD PERSONS NO EXCUSE. Where a telegraph company receives market quotations from the board of trade and the public are entitled to receive such quotations without discrimination, the court will compel the furnishing of such quotations to complainant even

though the board of trade, having power to dictate to the telegraph company, has instructed such telegraph company not to furnish the quotations to complainant. If the telegraph company obtains the quotations from any source and sends them to others they must send them to all.

6. COMMON CARRIERS—DUTY TO SERVE ALL—CONTRACT WITH THIRD PERSON NO EXCUSE. A common carrier cannot refuse to carry for one person because another person does not desire him to, or because the carrier is under contract not to do so.

7. PUBLIC USE—WHEN PROPERTY BECOMES AFFECTED WITH. Property becomes affected with a public interest and subject to control for the common good when used in a manner to make it a public consequence and affect the community at large.

8. COMMON CARRIERS—ORIGIN OF DUTY OF. The liabilities of common carriers were originally determined by the usages of trade, and the opinions of the judges predicated upon the obligations they assumed, and the nature of their business.

9. COMMON LAW—PRINCIPLES OF. The public welfare is the great and final test in matters at common law.

10. EQUITY—EXPANSION OF DOCTRINES OF. The system of equity is so constructed upon comprehensive and fruitful principles that it possesses an inherent capacity of expansion so as to keep abreast of each succeeding age and generation.

11. PUBLIC SERVICE CORPORATIONS—DISCRIMINATION—REMEDY AGAINST. Where a public service corporation discriminates in its dealings with the public there is no remedy at law, and a court of equity will exercise jurisdiction and issue a mandatory injunction to prevent such discriminations.

Motion to dissolve injunction in two cases.   Gen. No. 43,416 and Gen. No. 43,415.   Heard respectively before Judge Murray F. Tuley and Judge Thomas A. Moran.

For statement of facts see opinion.

*A. B. Jenks,* solicitor for complainants; *Leonard Swett, Lyman Trumbull* and *W. C. Goudy* of counsel.

*Williams & Thompson,* solicitors for Western Union Telegraph Co.   *C. C. Clarke,* solicitor for B. & O. Telegraph Co. *C. Beckwith* and *A. B. Wilson,* solicitors for Board of Trade of the City of Chicago.

*Opinion in First Case.*

TULEY, J.:—

This bill is filed by the complainant to restrain the defendant telegraph companies from removing from its place of busi-

ness three "tickers," and two Morse instruments placed there by the defendant companies, and to restrain them from cutting off and withdrawing from the complainant at their place of business information as to the market value of grain, provisions, stocks and other merchandise, upon the ground that the telegraph companies are the servants of the public, and under a duty by law which forbids them so acting.

It appears that the Western Union Telegraph Company obtained from the other defendant the right to use the "tickers" and placed the instruments in question in complainants' "place of business." The "tickers" are used for printing automatically upon a slip of paper the quotations of the market of the board of trade of Chicago and other centres of exchange, and the arrangement is such that the printing is exhibited to all the offices and places of business containing such instruments, at the same instant of time.

In this city a circuit is made from the board of trade, with the wires of which circuit the "tickers" and Morse instruments are both connected, so that all persons having such instruments may secure the quotations at the same moment.

The Western Union Company has a department of its business in operation for several years past known as "the Commercial News Dispatch Department." It has its agents upon the floor of the board of trade of this city, and of other exchanges at all the large commercial centers of trade throughout the country, and collects information as to the state of and fluctuations of the market at the different centres. This it transmits from one centre to the other, and to all the persons having such instruments in their places of business, so that, for example, in the city of Chicago, all such persons on the line of the circuit receive not only the quotations of the foreign markets, but also the quotations showing the fluctuations—at the instant they occur—of the market on the board of trade of Chicago, New York, Philadelphia, and the other large business centres of the United States. This business has been built up by the telegraph company as its answer alleges, "as an incidental branch of its regular telegraph business."

The telegraph company insists that this "commercial news

dispatch business,'' is private business of the company; that it is *ultra vires* its powers as a corporation, and therefore that it can furnish this commercial news and these instruments to, and withhold the same from any person it pleases. That as to that business it is not under the same obligation; as it is, —in its relation to the public, in regard to what it terms its regular business, to-wit, to treat all persons offering to do business with it alike, and without discrimination. If this position is a tenable one, it is fatal to complainants' case.

It is true that when telegraphy was first introduced, and when the Western Union Telegraph Company was chartered, its business was confined to sending messages over its wires, but since then great and wonderful changes in the methods of transacting commercial business have taken place, and no instrumentality has been so potential in bringing about these changes as the telegraph.

As said by Chief Justice Waite, in 1877, in the case of *Pensacola Telegraph Company v. Western Telegraph Company*, 96 U. S. 1: ''The electric telegraph marks an epoch in the progress of time. In a little more than a quarter of a century it has changed the habits of business and become one of the necessities of commerce: it is indispensable as a means of inter-communication, but especially so in commercial transactions. The statistics of the business before the recent reduction in rates showed that more than eighty per cent. of all the messages sent by telegraph related to commerce. Goods are sold and money paid up on telegraphic orders. Contracts are made by telegraphic correspondence, cargoes secured, and the movement of ships directed. The telegraphic announcements of the markets abroad regulates prices at home, and a prudent merchant rarely enters upon an important transaction without using the telegraph freely to secure information.''

The fact that such a large per cent. of all messages relate to commerce, may have suggested to the telegraph company that it might supply this demand for information as to the state of market to its own profit, and the convenience of the public by establishing in connection with its other business this commercial news department. Whatever may have been the in-

ducement it did establish that branch of business, and for years past it has been gathering the market quotations at all the large commercial centres, and transmitting them to its patrons at all such centres; so that we find its "tickers" and Morse instruments in hotels, banks, commission merchants' and brokers' offices, billiard and bar rooms, everywhere, in fact, that the interests of the public seems to require them, either as a convenience or a necessity. The parties who use this news and these instruments, and they form a very large number of the persons engaged in trade, "choose a subtle fluid for their agent, and by quickness and accuracy beat down competition." The value of the information which they demand depends upon the time, the day or the hour or minute, perhaps, that they may receive it.

The telegraph company admits that it has been furnishing complainant with these market quotations; that it is about to discontinue the same and remove the "tickers" and Morse instruments from complainant's place of business, and alleges as a reason for its contemplated action that it obtains its quotations or news as to the Chicago market by means of agents on the floor of the Chicago board of trade; that it has been notified by the managers of the board of trade that if it does not discontinue sending market quotations to what are known as "bucket-shops," its agents will be prohibited access to the floor of the board, and not allowed to collect any market quotations or other commercial news; and that complainant carries on a "bucket-shop," which is a place used for gambling upon the future prices of grain and other commodities.

If the complainant has a right to these market quotations, it is no concern of the telegraph company or of the board of trade as to what use it makes thereof, but a court of equity—whether the fact is set up as a defense or not—when it is made to appear that a complainant is seeking its aid to protect an immoral business like gambling, or a business prohibited by law, will not lend its assistance for any such purpose, but will dismiss the complainant's bill, and leave him to his remedy at law, if any he has. In this case, however, there is no proof that the complainant is engaged in any other than a legitimate

business.  The only evidence tending at all in that direction being that "bucket-shops" always "take the deal" or trade, and that this complainant does the same, but this is neither more nor less than every member of the board does in every case where as broker he buys or sells on the floor of the board.

The board of trade does not profess to be engaged in a moral reform movement, nor is its action aimed solely at the "bucket-shops," as the preamble to this resolution passed by its managers shows its grievance to be that "Market quotations—to the injury of our members,—are furnished parties no way contributing to the support of the board." It is competition—not immorality, which the board of trade is seeking to put down.

It is evident that if the managers can dictate that the quotations shall not be furnished this complainant, they may cut off from receiving the same, every merchant, commission-house, broker, banker, or other persons outside the board; and might, if they thought proper, dictate that only one man in New York, say Jay Gould or Keene should be permittted to receive them by telegraph.

In such case there would be but little difficulty in obtaining a monopoly in the dealing in and brokerage of grain and other commodities.

What forestalling of the market might take place, and what gigantic monopolies might be built up in commercial centres, where values are determined by the ruling prices on the Chicago board of trade.

Neither the establishing of monopolies nor the destroying of competition is looked upon with favor by the courts.

The corporation known as the Chicago board of trade was organized more than a quarter of a century ago by a few merchants of this city for their own convenience in the transaction of their business.  By reason of the wonderful development of the country tributary to Chicago as a commercial centre, the business done upon the floor of this board of trade has become a great and controlling factor in fixing the prices or value of grain, meats and other commodities, not only throughout the United States, but to some extent in Europe.

Millions upon millions of property, consisting principally of wheat, corn and meats—the common necessaries of life, are affected in value daily and hourly by the transactions had upon the floor of this board of trade. So widely extended and important has the influence of the business there transacted been upon the price of grain and provisions; so much is the public interested in knowing and in ascertaining the results from hour to hour of that business, that I cannot bring my mind to the conviction that this business, and these market quotations—if they are the property of the board—are not "affected with a public interest," whereby they cease to be private property only, within the principles so clearly and forcibly laid down in the Munn and Scott warehouse case, *ante*.

This market on the floor of the Board of Trade stands in "the gateway of commerce." The members on the floor of the board of trade take "toll" by way of commission upon four-fifths of the wheat and other products of the great northwest—an empire in itself. These products—such is the course of trade—must, whether the owners desire it or not, pass through this board of trade market. A membership of the board, which confers the privilege of participating in the taking of this "toll," is worth $10,000. It can make no difference in principle whether this "toll" is taken by the corporation or by the members; the result to the public is the same.

It may be true that neither the courts nor the legislature can interfere with its control of its own floor, or with the right of the board to discipline its members. But I am clearly of the opinion that the business transacted upon the floor of the board of trade is "affected with a public interest," to an extent which would authorize the legislature, and the courts in the absence of legislation, to prohibit the board of trade exercising any discrimination as to who shall receive from the telegraph companies these market quotations, or as to what telegraph companies shall be allowed facilities for distributing the information to the public.

It is opposed to the very spirit of its charter that it become a monopoly or a close corporation.

I am also of the opinion that even if the board of trade has the power to dictate to the telegraph companies as to who shall or shall not have the market reports or quotations, and should order (as it is alleged they have ordered) them not to furnish the same to complainant, that it would be no excuse or justification for the telegraph company removing these instruments or refusing to furnish the reports to complainants.

Can a common carrier say that he will not carry for A because B does not desire him to do so, or because he is under contract not to do so?

The case of the *State ex rel. v. Bell Telephone Company,* would appear to be decisive of this point. In that case the court held that "a public servant,"—as the respondent telegraph company is—"cannot avoid the performance of any part of the duty it owes to the entire public by any contract obligation it may enter into, even with the patentee of an invention. 11 Central Law Journal, 359.[1]

To establish any other rule would be to enable common carriers and others occupying as to the public a like position— as we have seen this telegraph company does—to avoid their duty and obligations as public servants.

Such parties are not content to know what was the price of the commodity with reference to which they deal, upon yesterday or last week, but demand the latest market price up to the very instant the business is transacted. It appears to me that there are principles laid down in what are known as the "Express Company cases," which are applicable to this case.

In those cases, the railroad companies contended that it was no part of their duty as common carriers to carry express matter *as such* and attempted to discriminate as to express companies.

Judge Baxter, in one of the first of these cases, said, "that no such question could have arisen a half century ago." He traces the origin and growth of the express business, shows how it has grown "under the fostering care of the railroads,"

---

[1] See Jones on Telegraph and Telephone Companies, p. 41.—Ed.

into a "public necessity," and how it had "so interwoven it-self into the present methods of doing business that it cannot be dispensed with, without producing an abrupt and disas-trous revolution in the present mode of carrying on trade." It was held in those cases that although originally it was no part of the duty of the railroads to carry express matter, yet having done so for so many years, and thereby aiding to build up the express business into a "public necessity," it had be-come as much their duty to carry express matter as to carry freight, and the common-law obligation not to discriminate applies to both. See *Dinsmore v. L. C. & L. Ry. Co.*, 2 Fed. 465; *Southern Express Co. v. Memphis, etc., R. R. Co.*, 8 Fed. 799, 13 Central L. J. 68; *Southern Express Co. v. St. Louis, I. M. & S. Ry. Co.*, 10 Fed. 210.[1]

As the express business grew into a public necessity under the fostering care of the railroads, so has the use of the mar-ket quotations grown into a public necessity under the foster-ing care of the telegraph companies. The knowledge of these market quotations, and the possession of facilities for ob-taining that knowledge at the instant of trading, have become a necessity to those engaged in buying and selling stocks, grain, provisions, etc., and has so interwoven itself into the modern method of doing business that they cannot and will not now be dispensed with. It is profitable to the telegraph companies, useful, convenient and necessary to the public.

Whatever the business may have been when first undertaken by the telegraph companies, it is now no longer a private busi-ness. It is general in its nature and has become, under the principles laid down in the Munn and Scott warehouse case, "affected with a public interest."

Property becomes affected with a public interest and sub-ject to control for the common good "when used in a man-ner to make it a public consequence, and affect the community at large." What is said in that case as to common carriers, may be said of this business carried on by the telegraph com-pany; that "in carrying on their business they have duties to

---

[1] But see *The Express Cases*, 117 U. S. 1.—Ed.

perform in which the public are interested." Therefore "their business is affected with a public interest within the meaning of the doctrine which Lord Hale has so forcibly stated." *Munn v. Illinois*, 94 U. S. 113.

Not only did the telegraph companies originate this business but they have furnished facilities for obtaining these market quotations for years past without discrimination, until it has become a public necessity that such facilities and such quotations shall be furnished all who desire them. They will not now be permitted to say that their common-law obligation not to discriminate—attaching to their business of sending messages does not attach to this new "incidental business," at least so long as they carry it on. To permit them to do so would be to allow them to commit a fraud upon, and work irreparable injury to, complainant and others, who have engaged in business upon the faith of having these market quotations to aid them in carrying on the same.

The position that legislative action is necessary to impose these obligations upon the defendants is not tenable.

"The liabilities of common carriers were originally determined by the usages of trade and the opinions of the judges predicated upon the obligations they assumed, and the nature of their business." Scott and Jarnagin on Telegraphs, p. 248; *Vincent v. Chicago, & Alton Railroad Co.*, 49 Ill. 33; *The Express Co. cases, ante.*

I therefore hold that so long as the defendant telegraph companies are permitted to have their agents upon the floor of the board and gather these market reports or quotations and send them to others, they will not be permitted to discriminate against the complainants. If they obtain the same— no matter from what source—and send them to others, they must send them to complainants.

The principles declared in this opinion are not new. They are as old as the time of Lord Hale, who enunciated them more than two hundred years ago.[1] They are simply old rules applied to new facts. It has been well said "that the public

[1] De Jure Maris, 1 Harg. Law Tracts, 6, 78; De Portibus Maris, 1 Harg. Law Tracts, 78.—Ed.

welfare is the great and final test in matters at common law,''
and this is eminently so as regards privileged classes and
monopolies.    Also that the system of equity ''is so constructed
upon comprehensive and fruitful principles that it possesses
an inherent capacity of expansion so as to keep abreast of each
succeeding age and generation.''

The motion to dissolve is overruled, and the injunction will
be retained until the final hearing.

### Opinion in Second Case.

MORAN, J.:—

This case I have considered since the arguments, and I have
not been able, from anything I have seen, to change the opin-
ion that I had formed at the time of the arguments—which I,
in fact, h^d formed before the arguments were made at all.
There have been in this case two motions to dissolve: one made
by the board of trade, which was granted on the ground that
the board of trade have the right to control their own prem-
ises and to permit anybody to come upon them or deny any-
body the right to come upon them.    At the time I dissolved
that motion I intimated that I thought it a very different
question with reference to the telegraph company.    I still
think the telegraph company stands upon an entirely different
basis.    The telegraph company is in the exercise of a public
franchise; it holds itself out according to the allegations of
the bill, and these allegations are not denied, to furnish these
commercial reports to such persons as agree to its reasonable
terms and regulations, and it is in the business of furnishing
to such persons as make contracts with it and comply with its
reasonable regulations, these commercial reports which it
gathers up, attracts into its possession or gets control of by
the messengers and agents it is permitted to have upon the
floor of the board of trade.    Now, it is said, it must refuse to
transmit these commercial reports to the complainant in this
case, because the board of trade says it shall do so, and
threatens to drive it off the board of trade and deprive it of
the facility of obtaining the information unless it complies
with that demand.    I have never seen how a telegraph com--

pany can be permitted, either of its own will or at the command or behest of another party, to discriminate in its service to the public. The theory that it may do this because this is not regular telegraph business—that is, it is not a dispatch signed by one person and handed to the company to be sent to another person, is the narrowest construction that can be given to telegraph business. To say it is in that business, and that the company need not engage in it if it does not want to, and then to argue from that, because the company might not be compelled, under forfeiture of its charter to engage in transmitting commercial news, that it may distinguish the persons it will transmit commercial news to, seems to me false reasoning. The business of transmitting commercial news has grown to be an exceedingly important business. I suppose it will not be extravagant to say, that it forms a very large part of the business of the telegraph companies as they are run at the present day. That the commercial information that they gather up by their agents at the different commercial centres, such as the price of grain, the price of stocks, railroad stocks, is most important information to the general public, and to people engaged in different occupations it can be seen at a glance. The business being to a certain extent incidental, is telegraph business in this sense: the company can exercise the power of eminent domain for the purpose of carrying it on; it has the right to condemn my land, or your land, or the land of any other citizen, and put its poles thereon for the express purposes of its business, and for this purpose alone of transmitting commercial news dispatches. If it exercises the power of eminent domain, it cannot be said that the business for which it exercises it, is special business and they can discriminate as to the persons they will send it to. The rule governing chartered bodies is always to prevent them discriminating against anybody, as that is the most dangerous way of building up monopoly. If the company can discriminate in the sending of commercial dispatches between different persons in a community, it may enrich one man and impoverish another one. Now, it does not seem that the law will permit that to be done upon any excuse whatever. The position taken

by counsel that a court of equity will not compel a company to transmit to an individual because the telegraph company can be made to supply the public, has its only support in cases. in which there were no public questions involved at all, but where it was a mere question of private interests. I think this is clearly shown in the case of *Hawley v. Beardsley*, 47 Conn. 571.

Now one of the distinguishing features of the telegraph company's business, or of a railway company's business or of an express company's business, is that for any attempt to discriminate there is absolutely no remedy at law. I can conceive no rule under which damages can be claimed. Of late this has been discovered and recognized all over the country. There is no other way to control these chartered companies. than by an appeal to a court of equity, and the courts of equity have issued these mandatory injunctions to prevent any discriminations at all. Now, there would appear some sort of incongruity in saying that the board of trade may drive anybody off its floors and still that the company must furnish these dispatches; in my opinion there is none whatever. I do not find it necessary to agree with a recent opinion that the board of trade may be controlled, or compelled to furnish, or let anyone get at its market reports. I do not find it necessary to decide that question one way or another. The board of trade may shut its doors and windows, and shut off all the ways by which its doings could be got to the public, and conduct its business in secret. That this would be a very bad thing for the board of trade to do I have no doubt. If the board of trade see fit to let the telegraph companies get the news, and the telegraph companies hold themselves out to supply it to all persons who will comply with its reasonable terms and regulations, it cannot give it to one person and withhold it from another. When the news passes from the board of trade to the telegraph companies, it belongs to the telegraph companies, and they must transmit to one person as another. If the board of trade puts the telegraph company off its floor, well and good. It is better that the telegraph company be prevented from getting the news at all than that it be per-

mitted under any excuse whatever to discriminate against any member of the public who wants to receive their work, and will comply with its reasonable conditions. As I said, if the board of trade puts the telegraph companies off its floors, well and good, the telegraph companies cannot send news they cannot get.

The gambling question is not in this case. It comes here as the case of a perfectly honest institution, carrying on, so far as the evidence before the court shows an honest business, just like any other honest business engaged in dealing on the board of trade. In that case a telegraph company engaged in transmitting commercial dispatches cannot refuse to supply it with such news; and, therefore, I cannot dissolve this injunction.

### NOTE.

The same conclusion was arrived at by the supreme court in *The New York and Chicago Grain and Stock Exchanye v. The Board of Trade of the City of Chicago*, 127 Ill. 153.

But in *Board of Trade of the City of Chicago v. Christie Grain and Stock Company*, 198 U. S. 236, it appeared that the Board of Trade collected at is own expense quotations of the prices offered and accepted, for wheat, corn and provisions in its exchange, and distributed them under contract to persons approved by it and under certain conditions. In a suit brought by it to restrain parties from using the quotations obtained and used without authority of the Board, defendants contended that as the Board of Trade permitted, and the quotations related to, transactions for the pretended buying of grain without any intention of actually receiving or paying for the same that the Board violated the Illinois bucket shop statute and that there were therefore no property rights in the quotations which the court could protect, and that the giving out of the quotations to certain persons makes them free to all. It was held that even if the pretended buying and selling is permitted by the Board of Trade it is entitled to have its quotations protected by the law, and to keep the work which it has done to itself, nor does it lose its property rights in the quotations by communicating them to certain persons, even though many, in confidential and contractual relations to itself, and strangers to the trust may be restrained from obtaining and using the quotations, by inducing a breach of the trust.—Ed.